## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14 CR 280 CEJ  / DDN |
| | ) | |
| ROY L. BRITT, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

The pretrial motions of the parties were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b).   An initial evidentiary hearing on the motion of defendant Roy L. Britt to suppress physical evidence and statements (Doc. 19) was held on November 14, 2014.   On November 24, 2014, on motion of the court a supplemental evidentiary hearing was held.

From the evidence adduced during the evidentiary suppression hearings, the undersigned makes the following findings of fact and conclusions of law:

## FACTS

1.   On September 2, 2014, around 11:00 p.m., St. Louis Metropolitan Police Detective Jason Flanery and his partner, Officer Michael Scego, were on patrol in the 3400 block of Virginia in the City of St. Louis.   The officers were in police uniform and were in a marked police Tahoe vehicle driven by Officer Scego.   As the officers turned north onto the 3400 block of Virginia they saw two male persons standing on the sidewalk on the west side of the street.   One of the individuals looked in the direction of the police vehicle, appeared to see it, and turned to his companion.   Officer Flanery saw

the second person[1] turn, also view the police vehicle, and begin walking away from his companion.

2.    As the officers' vehicle came near where the two persons had been standing, Officer Scego remarked to Flanery that the second person (defendant Britt) was walking away and appeared to be grabbing at his waistband.   The first person was not seen grabbing at his waistband.  At that time, Officer Scego slowed the police vehicle to a location near the two people and, with his window down, said "What's up guys?"  When Scego said this, Britt began running.

3.    Officer Flanery then left the police vehicle and chased Britt.  Britt ran two or three houses up the street and turned onto the front porch of 3417 Virginia.  Britt grasped the outside storm door handle with his left hand, bracing himself against the building with his right hand.   As Britt did this, Officer Flanery saw in Britt's right hand a chrome object, which the officer believed was a firearm.  Britt then opened the front door of the residence and ran inside.  He tried to slam the front door closed behind him but did not succeed in closing it.   Flanery, in pursuit just seconds behind Britt, entered the residence.[2]

4.    Immediately inside the residence Flanery saw an open living room on the left.  A hallway extended away from the living room, turned left and then right, and continued to the entry to the kitchen at the rear of the floor.  A bathroom and a bedroom were on opposite sides of the hallway.    As he entered the hallway, Flanery yelled, "Police," that the person being chased was under arrest, and commanding him to come to the officer.    Britt did not comply with this command.   Then, Officer Flanery heard a

———————————————

[1] The second person was later identified as defendant Roy L. Britt.

[2] Officer Flanery did not know who owned the house and had no prior experience with that residence.   Also, he did not know whether the man he was chasing had any connection with the house.   However, at that time, in his law enforcement experience, Officer Flanery knew that when chased by police, individuals sometimes enter residences of strangers.

- 2 -

woman scream from a nearby room which turned out to be a bedroom, "Poo Poo, you mother fucker.  Why're you always bringing this bull shit into my house?"     Then, Officer Flanery commanded, "I am a police officer entering your house."  He asked the woman to present herself.  In response, a woman[3]  came out of a bedroom into the hallway.  She then told the officer, "Poo Poo came in.  He just threw this gun on my bed, officer.  He [is] back in the kitchen."

5.     Officer Flanery asked her whether anyone else was in the house.  She said her boyfriend was in the bathroom across the hall from the bedroom.  Flanery then knocked on the bathroom door and said, "Hey man."  The man responded, "What's up?"  Flanery said he was a police officer and "For my safety just stay inside the bathroom until I come to get you.  Is that all right?"  The man agreed to do this.

6.     Then, Officer Flanery walked to the kitchen, located in the back of the house.  As he did so, he passed the bedroom where the female told him the firearm was on the bed.

7.     Then, Flanery then went to the kitchen entry, located at the end of the hall, and ordered the person inside the kitchen to come out of the kitchen.  When he did not comply, Flanery entered the kitchen with his flashlight on and with his firearm drawn.  The light in the kitchen was not on.   Flanery turned the kitchen light on and told Britt to turn around and put his hands behind his back.   Flanery then handcuffed Britt.

8.     After he was handcuffed, Britt saw Officer Scego enter the kitchen.  Without being asked any question, Britt spoke to both Scego and Flanery, saying he remembered the officers from a prior case, which the officers stated they did not remember.  Britt made statements reminding Scego about the earlier case.

9.     Then, Officer Flanery left the handcuffed Britt with Officer Scego and went into the bedroom with the woman.  She showed Flanery the gun on the bed.  This firearm

---

[3] Officer Flanery had had no prior contact with this woman.

was chrome plated and looked similar to the object Flanery had seen in Britt's hand when Britt opened the storm door to enter the residence.   Flanery seized the firearm from the bed.

10.     Officer Flanery returned to the kitchen and orally advised Britt of his constitutional rights to remain silent and to counsel.  Britt acknowledged he had those rights.  Without being asked any questions, Britt told Flanery that he was a felon and that he was wearing an ankle monitoring device.  Flanery asked him why he ran.  Britt said he ran because he had the felony conviction and did not want to be caught with the firearm. Flanery asked whether Britt would put that in a written statement.  Britt responded, saying he was 44 years old, had been in and out of  prison most of the last 27 years of his life, and "Do you really think I'm going to write something down for you all?"    The officers made no threat or promise to Britt to get him to make his oral statements to the officers.   During that incident Britt did not appear to be under the influence of alcohol or narcotics to the extent that he did not appear to understand what was happening or what he was saying.

11.     Before Britt was taken to the police station, the officers' supervisory sergeant arrived with two other officers.   After Britt was taken from the residence, Officers Flanery and Scego searched it.  During this search, the woman and her boyfriend were on the front porch with the sergeant and the other officers.   Officer Flanery photographed the inside of the residence with the sergeant's camera.   No evidence was seized from the residence during this search.   Officer Flanery was at the residence initially[4]  approximately 45 minutes.

12.     Nothing was seized from Britt's person by the police at the scene of his arrest.  Britt was taken by the officers to the St. Louis Justice Center.  There, two cell

_____

[4] Later, Officer Flanery returned to residence and took a written statement from the woman resident about the incident.

- 4 -

phones were taken from Britt's person, he was booked, and his ankle bracelet was removed from him.

## DISCUSSION

Defendant Britt moves to suppress the evidence acquired as a result of the September 2, 2014 incident.  The relevant issues are best discussed as they occurred.

When Officers Flanery and Scego first saw defendant Britt and his companion on the sidewalk in the 3400 block of Virginia, Officer Scego's action of calling out to them from the police vehicle "What's up, guys?" did not implicate the Fourth Amendment.  No seizure occurred by his asking that question.  The standard is an objective one, and is applied by asking whether a reasonable person in defendant Britt's circumstances then would have felt free to walk away from the scene.  Florida v. Bostick, 501 U.S. 429, 434 (1991); United States v. Perdoma, 621 F.3d 745, 749 (8th Cir. 2010).   The officer's question itself was not intimidating, threatening, or coercive.   While the two officers were uniformed and in a marked police vehicle, no police weapon was displayed, the officers did not physically touch Britt or his companion, they gave the two subjects no command or request to stop, and no evidence indicated that the officer's tone of voice reasonably implied a command to stay where they were.  Perdoma, 621 F.3d at 749; United States v. Ceja-Tinajero, 35 Fed. Appx. 284 (8th Cir. 2002) (unpublished per curiam).

Defendant Britt's sudden flight on foot from the scene, following the officers' observations that Britt had begun walking away from his companion, grabbing at his waistband, after he saw the officers, reasonably indicated to the officers that Britt then might be involved in criminal activity.  Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) ("Headlong flight -- wherever it occurs -- is the consummate act of evasion.  It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. . . .   We

conclude [the officer] was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further.").

When the officers began chasing defendant on foot, the Fourth Amendment was not implicated, because no seizure occurred until his physical arrest was made inside the residence.  California v. Hodari D , 499 U.S. 621 (1991); Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1207-08 (8th Cir. 2013).

By the time Officer Flanery placed defendant Britt in handcuffs in the kitchen, he had seen Britt with what appeared to possibly be a handgun in his right hand (when Britt opened the storm door of the residence), he heard the woman inside the residence loudly complain to "Poo Poo" that he was again bringing trouble into her residence, and the woman had told Flanery that his suspect had put a gun on the bed in the bedroom. Therefore, Flanery had sufficient information to establish reasonable grounds to believe, if not probable cause to believe, that Britt had unlawfully possessed the firearm he put on the bed in the bedroom.  Terry v. Ohio,  392 U.S. 1, 21, 28-31 (1968)  (ruling that to justify stopping a person for further investigation, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"); Beck v. Ohio, 379 U.S. 89, 96 (1964) (ruling that to justify an arrest without a warrant "the facts available to the officers at the moment of the arrest would warrant a man of reasonable caution in the belief that an offense has been committed") (internal citation omitted).

Any doubt about probable cause to arrest Britt evaporated when, without being questioned, Britt stated to Officer Britt and then to Officer Scego that they had been previously involved in a case of his, and, after he had been advised of his constitutional rights to remain silent and to counsel, Britt told Officer Flanery about his prior felony conviction being the reason he fled.

The warrantless seizure of the firearm from the bedroom was lawful.  Exigent circumstances were presented by the police pursuit of someone reasonably suspected of

criminal activity, the suspect rushing into a residence reasonably appearing to be holding a firearm in his hand, the suspect leaving the firearm in a bedroom as he continued his flight, and the presence of others in the residence.  For the protection of the pursuing officers and the safety of the other people in the residence, Officer Flanery acted reasonably under the Fourth Amendment by seizing the firearm.  Warden v. Hayden, 387 U.S. 294, 298-99 (1967).  Therefore, the firearm should not be suppressed as evidence against Britt.

Defendant Britt's statements to the officers should not be suppressed.  All of his statements, both before he was advised of his Miranda[5] rights and after, were constitutionally voluntary, because they were not the result of overreaching, such as coercion, deception, or intimidation by the police; his will was not overborne and his ability to decide not to cooperate was not impaired.  Colorado v. Connelly, 479 U.S. 157, 169-70 (1986); United States v. Lebrun, 363 F.3d 715, 724 (8th Cir. 2003).

The statements made by defendant Britt in the kitchen prior to the advice of Miranda rights should not be suppressed, because they were not the result of any police interrogation or its functional equivalent.  Rhode Island v. Innis, 446 U.S. 290, 300-01 (1980) (defining "interrogation" and "its functional equivalent" as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.").  Rather, without being subjected to interrogation, Britt initiated a conversation with the officers about his belief that they were involved in a prior criminal investigation of him.   Such volunteered statements by a suspect, which are not the result of interrogation, are not subject to the Miranda advice of rights requirement.  Miranda v.

---

[5] Miranda v. Arizona, 384 U.S. 436, 479 (1966) ("[A suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.").

Arizona, 364 U.S. at 478;  United States v. Crisolis-Gonzalez, 742 F.3d 830, 836-37 (8th Cir. 2014).

The statements he made after the Miranda rights were given to him should not be suppressed, because as to them  he waived his rights to counsel and to remain silent. The waiver of Miranda rights need not be explicit, but may be implied from the totality of the circumstances, including the background, experience, and conduct of the accused.  North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979); United States v. Griffith, 533 F.3d 979, 984-85 (8th Cir. 2008).  By his own volunteered statements to the officers about his earlier case, Britt demonstrated experience with the criminal justice system, he was then of a mature age (44 years, as he told the officers), and he acknowledged the Miranda rights when Officer Flanery advised him of them in the kitchen.

The items of evidence seized from defendant at the police station, if offered by the government into evidence at trial, should not be suppressed.  They were taken from Britt during his booking at the police station.  Illinois v. Lafayette, 462 U.S. 640, 646-47 (1983) (holding, "At the stationhouse, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed.").

## <u>RECOMMENDATION</u>

For the reasons set forth above,

**IT IS HEREBY RECOMMENDED** that the motion of defendant Roy L. Britt to suppress evidence (Doc. 19)  be denied

The parties have until not later than January 6, 2015 to file written objections to this Report and Recommendation.   The failure to file timely written objections may waive the right to appeal issues of fact.


                           _____/S/   David D. Noce_____
                           **UNITED STATES MAGISTRATE JUDGE**

Signed on December 15, 2014.

- 9 -